**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | | |
|---|---|---|
| **BRYAN VOLZ,** | * | |
| **Plaintiff** | * | **Civil Action No.** |
| **v.** | * | |
| **VERIZON COMMUNICATIONS, INC.** | * | |
| **and** | * | |
| **COINBASE, INC.,** | * | |
| **Defendants.** | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## COMPLAINT

Plaintiff, Bryan Volz ("Plaintiff"), by his undersigned counsel and pursuant to, *inter alia*, FED. R. CIV. P. 3 and 8 submits the following Complaint against Defendants, Verizon Communications, Inc. ("Verizon") and Coinbase, Inc. ("Coinbase," and collectively with Verizon, "Defendants").

## NATURE OF ACTION

1.      This action arises out of a course of conduct where the acts and the failure to act by Defendants caused the theft of approximately $452,000 (at the time of the occurrence) of cryptocurrency belonging to Plaintiff (the "Crypto Theft").

2.      During this course of conduct, more fully set forth herein, Verizon failed to protect its wireless cell service subscriber, the Plaintiff, from being victimized by an unauthorized SIM Swap performed at a Verizon store located in Indianapolis, Indiana, involving a Verizon employee at that location (the "SIM Swap").  A "SIM Swap" refers to a scheme where third-party hackers

6159681.1

take control of a victim's wireless phone number.  The hackers then use that phone number to access the victim's digital accounts, such as email, file storage, and financial accounts.

3.      Defendant Coinbase engaged in similarly egregious conduct, ignoring Plaintiff's repeated requests both in advance of the Crypto Theft and during the theft's occurrence to protect his Coinbase Accounts (defined below) from being unlawfully compromised.

4.      As a result of both Defendants' conduct, Plaintiff was victimized by the Crypto Theft, including 120.280739 in Ethereum ("ETH") being stolen from Plaintiff's Coinbase Accounts.

5.      Plaintiff brings this action to hold Verizon and Coinbase accountable for their violations of federal and state law, and to recover for the grave financial and personal harm suffered by Plaintiff as a direct result of the Defendants' acts and omissions, as detailed herein.

6.      Plaintiff seeks compensatory damages, statutory damages, treble damages, restitution, disgorgement, punitive damages, attorneys' fees, cost of suit, interest and other relief.

**I.      THE PARTIES**

7.      Verizon is a telecommunications company incorporated in the state of Delaware.

8.      Verizon's headquarters are located at 1095 Avenue of the Americas, New York, New York 10036.

9.      Verizon is one of the world's largest telecommunications companies and is a provider of mobile telephone services.

10.     Verizon is a "common carrier," as defined in the federal Telecommunications Act of 1996 (the "Act," or the "FCA").

11.     As such, Verizon is governed by the FCA, the Federal Communications

Commission (the "FCC"), and the regulations promulgated by the FCC.[1]

12.     Defendant Coinbase, Inc. operates a cryptocurrency exchange and other related businesses around the world via its website and cellular phone applications, and is incorporated in the state of Delaware.

13.     Coinbase has its principal place of business in San Francisco, California.

14.     Plaintiff is, and at all relevant times was, a resident of Maryland. Plaintiff currently resides in Forest Hill, Maryland.

**II.      JURISDICTION AND VENUE**

15.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because this case presents a federal question under the FCA.

16.     The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because those claims and Plaintiff's claims arising directly under Federal law arise out of a common nucleus of operative facts.

17.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of a different state than both Defendants Verizon and Coinbase, and the amount in controversy exceeds $75,000.

18.     This Court has personal jurisdiction over Defendants Verizon and Coinbase because both Verizon and Coinbase purposefully direct their conduct at Maryland, transact substantial business in Maryland, have substantial aggregate contacts with Maryland, have engaged and are engaging in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in Maryland.

19.     Verizon also purposely avails itself of the laws of Maryland by providing service

---

[1] 47 C.F.R. § 64.2001 *et seq.*

to many Maryland citizens and has multiple physical stores operating within the state. Plaintiff purchased his Verizon wireless plan in Maryland, visited Verizon retail locations in Maryland, and was injured in Maryland by the acts and omissions alleged herein.

20.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because part of the conduct giving rise to Plaintiff's claims occurred in this District, and Defendants transact business in this District. Plaintiff purchased his Verizon wireless plan in this District and obtained his Coinbase Account in this District. Plaintiff was harmed in this District, where he resides, by both Defendants' acts and omissions, as detailed herein.

## III.     FACTUAL BACKGROUND

### A. Plaintiff Opens a Cryptocurrency Account With Coinbase.

21.     Cryptocurrencies are digital assets that are backed by decentralized computer networks, rather than by central banks or issuing authorities like fiat currencies such as the U.S. dollar, the Mexican peso, or the Euro. A well-known example of a cryptocurrency is Bitcoin, launched in 2009.

22.     Unlike traditional fiat currencies that have the support of governments, cryptocurrencies rely on digital ledgers, which are public databases that contain the entire ownership and transaction history of every cryptocurrency "coin."

23.     The information in these ledgers cannot be altered. These secure ledgers, along with a limited number of "coins", allow cryptocurrencies to function like other funds or assets that can be maintained in an account.

24.     These "coins" are often bought and sold in exchange for fiat currency or for other cryptocurrency coins through various platforms.

25.    To trade cryptocurrencies, consumers rely on cryptocurrency exchanges such as Coinbase.   A Cryptocurrency exchange is a novel form of financial institution that stores consumers' funds and assets, and provides a platform for the exchange of those funds and assets on the open market.

26.    Coinbase is one of several cryptocurrency exchanges.

27.    Through its platform, Coinbase acts as a custodian for its customers' funds as well as an operator of a cryptocurrency exchange on which customers may buy, sell, and trade cryptocurrencies directly on the Coinbase platform.

28.    Coinbase was founded in 2012 and has since grown into one of the biggest names in cryptocurrency.

29.    At its initial public offering in 2021, Coinbase's value was reportedly $47 billion.

30.    Recently, Coinbase claims more than 103 million customers with trades totaling more than $200 billion per quarter, all on a Coinbase platform supported by nearly 5,000 employees.

31.    Coinbase focuses its business on ordinary retail investors by persuading ordinary consumers to sign up to trade cryptocurrency.  Coinbase's 2021 annual report touted its "simple onboarding process that allows retail users to sign up and quickly purchase their first crypto asset" and claimed that Coinbase is "a primary on-ramp for customers' journeys into the cryptoeconomy."

32.    Coinbase has targeted its marketing towards the general public.  For example, Coinbase spent an estimated $13 million to broadcast a one-minute commercial nationwide on NBC during the Super Bowl in February 2022.

33.     In furtherance of its "retail crypto" efforts, Coinbase encourages users to invest their retirement savings in cryptocurrency through web advertisements like "The Crypto Guide to Retirement Savings."

34.     Coinbase even partners with 401(k) plan provider ForUsAll to encourage users to invest their retirement savings in the cryptocurrency market.

35.     Coinbase touts its security, with its website being replete with representations about the safety and security of Coinbase users' assets.  Coinbase's website, www.coinbase.com, represents that Coinbase users can "[s]imply and securely buy, sell, and manage hundreds of cryptocurrencies" and that it provides "accessible, safe, and secure financial tools for everyone."

36.     Coinbase includes in its website numerous representations about its safety and security, touting trust, secure storage and asset protection.  Coinbase's website also touts its risk programs and the availability of assistance for users when needed.   Many of these representations are featured prominently on Coinbase's website.

37.     Coinbase has admitted that it knows of the dangers that hackers and scammers pose to its users.  In its 2021 Form 10-K, Coinbase acknowledged that a "risk-factor" to its business was "cyberattacks and security breaches of our platform, or those impacting our customers or third parties "because they could adversely impact our brand and reputation and our business, operating results and financial condition."

38.     These issues with cryptocurrency security are widely known.  Michael Hsu, the acting chief executive officer of the Office of the Comptroller of the Currency,[2] recently decried the "unabating volume of scams, hacks and fraud" in cryptocurrency and urged caution about

---

[2]     The OCC ensures that the federal banking system operates in a safe and sound manner, provides fair access to financial services, treats customers fairly, and complies with applicable laws and regulations.

allowing cryptocurrency to interact directly with more traditional financial institutions.[3] Hsu said that "people get hurt" when cryptocurrency peddlers, like Coinbase, use "familiar" terminology to "downplay or mask the risks involved" in trading cryptocurrencies.[4]

39.     These issues also disproportionately affect Coinbase and its customers, because Coinbase has pursued the "retail crypto" business strategy to take advantage of unwary consumers.

40.     Upon information and belief, Coinbase is targeted more than other cryptocurrency exchanges by malicious actors because such actors know that Coinbase attracts casual, unsophisticated crypto investors who are especially susceptible to their schemes.

41.     Coinbase continues to use familiar bank-like language about security in order to attract these casual, non-technical retail customers.

42.     As Coinbase has acknowledged on multiple occasions, its representations regarding security are material to consumers and are important in Coinbase's attempt to maintain a competitive edge over its competitors. Gaining the trust of ordinary consumers by marketing its platform as the "most secure" is central to Coinbase's brand and competitive strategy.

43.     On or about September 11, 2020, Plaintiff opened an account with Coinbase for the purpose of trading cryptocurrency.

44.     After Plaintiff opened his account, Coinbase provided him with a Coinbase Pro account by Coinbase in addition to his original account (both accounts, collectively, the "Coinbase Accounts").

---

[3]     Remarks at DC Fintech Week 2022 "Skeuomorphism, Commingling, and Data Gaps in Crypto" October 11, 2022.

[4]     Id.

**B. Verizon Employees SIM Swap Plaintiff's iPhone and Empty His Coinbase Accounts.**

45.     A SIM ("subscriber identity module") card is a small, removable chip that allows a cell phone to communicate with a wireless carrier and allows the carrier to identify the subscriber account associated with that phone.

46.     The connection between the phone and the SIM card is made through the carrier, which associates each SIM card with the physical phone's IMEI ("international mobile equipment identity"), which is analogous to the phone's serial number.

47.     The SIM card associated with a wireless phone can be changed.  A wireless customer can associate his or her account with a new SIM card and a new phone's IMEI by working with the carrier to effectuate a change.  This allows carrier customers to move their wireless number from one cell phone to another and to continue accessing the carrier network when they switch cell phones.

48.     At the time of the SIM Swap, Plaintiff owned an iPhone (the "iPhone"), and had an account with Verizon for the providing of cellular service, also referred to as a "wireless plan," with respect to the iPhone (the "Verizon Account").

49.     The iPhone has an internal SIM card.

50.     On December 30, 2021, an unknown individual switched out the SIM card related to Plaintiff's Verizon Account.

51.     The unauthorized transaction took place in the state of Indiana and occurred around 11:00 a.m. eastern time.

52.     Only Verizon can authenticate a request to associate an existing SIM card with a new phone, and only Verizon can effectuate the SIM card change.

53.     Verizon expressly permits its employees to conduct SIM card changes for its

8

customers either remotely or in its retail stores.

54.     At the time of the SIM Swap, Plaintiff was locked out of his Verizon Account, which prompted Plaintiff to immediately reach out to Verizon as to the reason for his Verizon Account being locked.

55.     Plaintiff was then informed of the SIM Swap by a Verizon employee with whom he was communicating by phone.  Immediately upon learning of the SIM Swap, Plaintiff went to a local Verizon store near his home located in Bel Air, Maryland.

56.     Notwithstanding Plaintiff's prompt action, the SIM Swap described herein effectively moved Plaintiff's wireless phone and his Verizon Account, including any incoming data, texts, and phone calls associated with Plaintiff's phone, from his phone to a phone controlled by the perpetrator of the SIM Swap.

57.     As a result of the SIM Swap, Plaintiff's phone lost its connection to the Verizon network, effectively locking Plaintiff out of his Verizon Account.

58.     This completely deprived Plaintiff of control over his own Verizon account, placing control with the perpetrator of the SIM Swap instead.

59.     Plaintiff was only able to regain control of his Verizon Account between 12:00 p.m. and 12:30 p.m. on December 30, 2021.

60.     However, by this point the compromise of his Verizon Account had led to the Crypto Theft.

61.     The SIM Swap could not have occurred without Verizon's involvement.  In order for the SIM Swap to have occurred, Verizon must have received a request to change Plaintiff's SIM card and then transferred Plaintiff's phone number from the SIM card in Plaintiff's iPhone to a different SIM card.

62.     During the SIM Swap, Verizon employees not only accessed Plaintiff's Verizon Account and authorized changes to it without his consent, they actively issued a SIM card for a cellular phone that was not associated with Plaintiff's Verizon Account.

63.     Verizon thus actively issued a new SIM card on Plaintiff's Verizon Account notwithstanding that (a) he was not present for the swap, (b) his phone was not present for the swap, and (c) his account address was several hundred miles from the site of the swap.

64.     While the perpetrator or perpetrators had control over Plaintiff's Verizon Account, they used that control to access and reset the passwords for Plaintiff's accounts on the Coinbase cryptocurrency exchange platform to effectuate the Crypto Theft.

65.     Plaintiff has experienced immense harm as a result of the SIM Swap.  Plaintiff's highly sensitive and confidential personal, legal, and business information were compromised as a result of the SIM Swap and he has been forced to expend significant sums of money to attempt a recovery of the funds lost as a result of the Crypto Theft and to pursue this litigation.

III.     **CLAIMS FOR RELIEF**

**COUNT I**
**Violations of The Telecommunications Act, 47 U.S.C. § 201 *et seq.***
**(Against Verizon)**

66.     Plaintiff realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

67.     As a common carrier, Verizon is entrusted with the sensitive wireless account information and personal data of Plaintiff, along with millions of other Verizon customers.

68.     Verizon recognizes the sensitivity of this data.  On its website, Verizon has a significant amount of information available to its customers and prospective customers, including the following statement:

**We think about online security all the time**.
So you don't have to. We want your account to be easy to access—but only by you.
At Verizon, we're committed to maintaining the confidentiality of your online data
and to keeping your account safe from cyber criminals, hackers and security
breaches.
That's why we use enhanced technologies to protect your sensitive personal
information. When you set up your **My Verizon** account, we'll ensure your account
is as secure as possible by providing step-by-step instructions to help you.[5]

69.     The Act requires Verizon to protect the privacy and security of information about

its customers.[6]

70.     The Act also requires Verizon's practices related to the collection of information

from its customers to be "just and reasonable" and declares unlawful any practice that is unjust or

unreasonable.[7]

71.     Verizon's most specific obligations to protect its customers concern Customer

Proprietary Network Information ("CPNI").[8]

72.     The Act defines "CPNI" as "information that relates to the quantity, technical

configuration, type, destination, location, and amount of use of a telecommunications service

subscribed to by any customer of a telecommunications carrier, and that is made available to the

carrier by the customer solely by virtue of the carrier-customer relationship; and … information

contained in the bills pertaining to telephone exchange service or telephone toll service received

by a customer of a carrier."[9]

73.     With respect to CPNI, the FCA "requires telecommunications carriers to take

---

[5]  Verizon website, Support, Billing & Account, Account security and authentication. March, 2023.  Emphasis in
original.
[6] 47 U.S.C. § 222.
[7] 47 U.S.C. § 201(b).
[8] 47 U.S.C. § 222(a).
[9] 47 U.S.C. § 222(h)(1).

specific steps to ensure that CPNI is adequately protected from unauthorized disclosure."[10]

74.     Under the FCA, carriers such as Verizon are liable for failures to protect their customers' information from unauthorized use or disclosure.[11]

75.     The FCC has also confirmed this liability: "[t]o the extent that a carrier's failure to take reasonable precautions renders private customer information unprotected or results in disclosure of individually identifiable CPNI, … a violation of section 222 may have occurred."[12]

76.     The FCA also expressly authorizes private actions against common carriers that either (a) "…do, or cause or permit to be done" anything prohibited by the FCA, or (b) "omit to do" anything required by the FCA.[13]

77.     In short, the Act required Verizon to, *inter alia*, protect Plaintiff's CPNI from unauthorized disclosure or use.

78.     Verizon failed to do so.

79.     The Act and its implementing regulations also expressly require Verizon to:

        a.  establish effective safeguards to protect against unauthorized use or disclosure of CPNI;

        b.  implement a system by which the status of a customer's CPNI approval can be clearly established prior to the use of CPNI;

        c.  design its customer service records in such a way that the status of a customer's CPNI approval can be clearly established;

        d.  maintain records that track access to customer CPNI records;

---

[10] Report and Order and Further Notice of Proposed Rulemaking, *In the Matter of Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information,* 22 F.C.C. Rcd. 6927 ¶ 1 (April 2, 2007) (hereafter, "2007 CPNI Order").
[11] 47 U.S.C. §§ 206, 207.
[12] Declaratory Ruling, *In the Matter of Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information & Other Customer Information*, 28 F.C.C. Rcd. 9609 ¶ 30 (2013) (hereafter, "2013 CPNI Order").
[13] 47 U.S.C. §§ 206, 207.

e.   train its personnel as to when they are and are not authorized to use CPNI;

f.   have an express disciplinary process in place for employees who misuse CPNI;

g.   maintain a record of all instances where CPNI was disclosed or provided to third parties, or where third parties were allowed access to CPNI;

h.   take reasonable steps, which may include encryption, to protect its CPNI databases from hackers and other unauthorized attempts by third parties to access CPNI; and

i.   inform customers – and law enforcement – "whenever a security breach results in that customer's CPNI being disclosed to a third party without that customer's authorization."

80.   Verizon failed to do any of the foregoing.

81.   As a direct and proximate result of Verizon's actions and failures to act, Plaintiff suffered direct monetary damages in the amount of at least $452,000.

82.   As a direct and proximate result of Verizon's actions and failures to act, Plaintiff also suffered damages to his physical and mental health.

WHEREFORE, Plaintiff Bryan Volz requests that this Court enter judgment in his favor and against Verizon for (A) compensatory damages in the amount of at least $452,000, or in such other amount as may be proven at trial; plus (B) pre-judgment interest as allowed by law in the sound discretion of this Court; (C) post-judgment interest at the statutory rate; plus (D) the reasonable costs and fees of attorneys' and expert witnesses (whether testifying or non-testifying) incurred by Plaintiff in this action; plus (E) such other and further relief as the nature of Plaintiff's

cause may require.

## COUNT II
### Violations of the Maryland Constitutional Right to Privacy
### (Against Verizon)

83.     Plaintiff realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

84.     The Maryland Constitution declares  "[t[hat no man ought to be … deprived of his life, liberty or property … by the Law of the land ." Md. Const. Art. 24, § 1.

85.     Plaintiff has a reasonable expectation of privacy in his mobile device and his Verizon account information.

86.     Verizon intentionally intruded on and into Plaintiff's solitude, seclusion, or private affairs by allowing its employees and third parties to improperly access Plaintiff's confidential Verizon account information without proper consent or authority.

87.     The reasonableness of Plaintiff's expectations of privacy is supported by Verizon and its agents' unique position to safeguard his account data, including the sensitive and confidential information contained therein, and protect Plaintiff from SIM swap attacks.

88.     Verizon and its agents' intrusions into Plaintiff's privacy are highly offensive to a reasonable person. This is evidenced by federal legislation enacted by Congress and rules promulgated and enforcement actions undertaken by the FCC aimed at protecting Verizon customers' sensitive account data from unauthorized use or access.

89.     The offensiveness of Verizon's conduct is heightened by both its material misrepresentations to Plaintiff concerning the safety and security of his account and its blatant disregard of Plaintiff's attempts to thwart the unlawful SIM Swap by Verizon employees.

90.     Plaintiff suffered great personal and financial harm by the intrusion into his private

affairs, as detailed throughout this Complaint.

91.    Verizon's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiff. But for Verizon employees' involvement in a conspiracy to rob Plaintiff, and Verizon's failure to protect Plaintiff from such harm through adequate security and oversight systems and procedures, Plaintiff would not have had his personal privacy repeatedly violated and would not have been a victim of SIM swap theft.

92.    Verizon's actions were malicious, oppressive, and willful. Verizon knew or should have known about the risks faced by Plaintiff, and the grave consequences of such risks. Nonetheless, Verizon utterly failed to protect Plaintiff – instead allowing its employees to profit to his detriment. Punitive damages are warranted to deter Verizon from engaging in future misconduct.

WHEREFORE, Plaintiff Bryan Volz requests that this Court enter judgment in his favor and against Verizon for (A) compensatory damages in the amount of at least $452,000, or in such other amount as may be proven at trial; plus (B) punitive damages in amount to be determined at trial; plus (C) pre-judgment interest as allowed by law in the sound discretion of this Court; plus (D) post-judgment interest at the statutory rate; plus (D) such other and further relief as the nature of Plaintiff's cause may require.

## COUNT III
### Negligence
### (Against Verizon)

93.    Plaintiff realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

94.    Verizon owed Plaintiff statutory and common law duties to Plaintiff to, *inter alia*, secure his account and safeguard the confidential and sensitive information therein.

95.     This duty included, among other things, the duty to design, maintain, monitor, and test its own systems, protocols, and practices, and to monitor and test the systems, protocols, and practices of its agents, partners, and independent contractors , to ensure that Plaintiff's information was adequately secured from unauthorized access.

96.     Verizon owed a duty to Plaintiff to disclose to him that its data security practices were inadequate to safeguard Plaintiff's Verizon account data from unauthorized access by its own employees and others.

97.     Verizon also owed Plaintiff a duty to properly hire, train, supervise, and promote its employees.

98.     Verizon had the unique ability to protect its systems and the data Verizon stored thereon from unauthorized access.

99.     Plaintiff's willingness to contract with Verizon, and thereby entrust Verizon with his confidential and sensitive account data, was predicated on the understanding that Verizon would undertake adequate security and consent precautions.

100.    Verizon breached its duties to Plaintiff by, *inter alia*: (a) failing to implement and maintain adequate security practices to safeguard Plaintiff's Verizon account and data, including Plaintiff's CPNI, from unauthorized access, as described herein; (b) failing to detect unauthorized access in a timely manner; (c) failing to disclose that Verizon's data security practices were inadequate to safeguard Plaintiff's data; (d) failing to supervise its employees and prevent employees from accessing and utilizing Plaintiff's Verizon account and data without authorization; and (e) failing to provide adequate and timely notice of unauthorized access.

101.    Verizon also breached its duty by failing to authorizing prevent the SIM Swap, and/or by failing to prevent damages from it.

102.     Neither Plaintiff nor anyone else could swap Plaintiff's SIM card without Verizon's involvement.  Because SIM change requests all had to be routed through Verizon, Verizon alone was positioned to prevent unauthorized SIM changes.

103.     Verizon knew or should have known that the individual seeking to effectuate the SIM Swap was not the Plaintiff.

104.     Verizon knew that Plaintiff was a Maryland resident, because Plaintiff's address is part of the personal information associated with Plaintiff's Verizon account.

105.     Nonetheless, Verizon effectuated the transfer of Plaintiff's Verizon account to a different cell phone, apparently somewhere in Indiana.

106.     A SIM swap requested in Indiana for a Maryland resident located in Maryland at the time of the swap should have alerted Verizon to the attempted criminal activity.

107.     Verizon should have insisted that a customer seeking to swap SIM cards provide photo identification, to insure that the swap was in fact authorized by the customer, and should have ensured that its employees always requested identification before swapping SIM cards.

108.     Additionally, Verizon employees' breach of Plaintiff's account and the subsequent SIM swaps were foreseeable. Verizon knew or should have known that Plaintiff's account was at risk, but nonetheless failed to secure his account and failed to properly supervise and train its employees.

109.     Verizon has known for more than a decade that third parties frequently attempt to access wireless customers' accounts for fraudulent purposes.

110.     In 2007, the FCC issued an order strengthening its CPNI rules in response to the growing practice of "pretexting."[14] Pretexting is "the practice of pretending to be a particular

---

[14] 2007 CPNI Order.

customer or other authorized person in order to obtain access to that customer's call detail or other private communication records."[15]

111.    This 2007 Order put Verizon on notice that its customers' accounts were vulnerable targets of the third-parties seeking unauthorized access.

112.    Verizon also knew, or should have known, about the risk that SIM swap crimes presented to its customers. SIM swap crimes have been a widespread and growing problem for years.

113.    Verizon knew or should have known that it needed to take steps to protect its customers from SIM swaps and other account hijacks.

114.    The FTC has confirmed that "mobile carriers are in a better position than their customers to prevent identity theft through mobile account hijacking[.]"[16]

115.    The FTC urged carriers such as Verizon to "adopt a multi-level approach to authenticating both existing and new customers and require their own employees as well as third-party retailers to use it for all transactions."[17]

116.    Verizon was therefore well aware of the significant risk that Verizon employees and SIM swapping presented to its customers, and the need to mitigate such risks, but nonetheless failed to take adequate steps to protect Plaintiff and others like him.

117.    Plaintiff, meanwhile, acted reasonably and with ordinary care.

118.    In fact, Plaintiff took all the steps that Verizon authorized him to in order to protect his account, including changing his passcode.

119.    In response, Verizon repeatedly told him that taking these steps would protect his

---

[15] *Id.* at ¶ 1.
[16] *Id.* (emphasis added).
[17] *Id.*

account from breaches and SIM swaps.

120.    At all relevant times, all Verizon employees were acting within the scope of their employment.

121.    Accordingly, Verizon is liable to Plaintiff for the acts and omissions of those employees described in this Complaint, including (without limitation) the various breaches of duty described in this count of the Complaint.

122.    As a direct and proximate result of Verizon's repeated breaches of its various duties to Plaintiff, Plaintiff suffered damages, including (without limitation) substantial monetary loss, and related severe emotional distress.

WHEREFORE, Plaintiff Bryan Volz requests that this Court enter judgment in his favor and against Verizon for (A) compensatory damages in the amount of at least $452,000, or in such other amount as may be proven at trial; plus (B) post-judgment interest at the statutory rate; plus (C) such other and further relief as the nature of Plaintiff's cause may require.

## COUNT IV
### Negligent Hiring, Retention, and/or Supervision
### (Against Verizon)

123.    Plaintiff realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

124.    Verizon conducts its business activities through employees or other agents.

125.    The actions and omissions of Verizon employees, acting within the scope of their employment, proximately caused harm to Plaintiff, as more fully described above.

126.    Verizon knew, or in the exercise of reasonable care and diligence should have known, that its employees could cause harm to Plaintiff and others like him.

127.    Verizon failed to exercise reasonable care in selecting, hiring, supervising, and

retaining the employees described in this Complaint.

128.    Verizon had a duty to Plaintiff and other similarly-situated customers to use reasonable care to select employees competent and fit for the work assigned to them.

129.    Verizon also had a duty to Plaintiff and other similarly-situated customers to refrain from retaining the services of an unfit employee.

130.    Verizon breached these duties to Plaintiff by, *inter alia*, hiring and retaining the employees who participated in the SIM Swap.

131.    As a direct and proximate result of Verizon's breaches of its duties to Plaintiff, Plaintiff suffered harm.

WHEREFORE, Plaintiff Bryan Volz requests that this Court enter judgment in his favor and against Verizon for (A) compensatory damages in the amount of at least $452,000, or in such other amount as may be proven at trial; plus (B) post-judgment interest at the statutory rate; plus (C) such other and further relief as the nature of Plaintiff's cause may require.

**COUNT V**
**Negligent Misrepresentation**
**(Against Verizon)**

132.    Plaintiff realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

133.    As set forth above, Verizon owed Plaintiff a duty to speak truthfully regarding, *inter alia*, (a) its ability and capacity to protect his CPNI and his account, (b) the actions it took to protect his CPNI and his account, and (c) breaches of his account.

134.    Verizon repeatedly represented to Plaintiff, publicly and otherwise, that it could and would protect Plaintiff's personal information and account.

135.    Verizon also represented to Plaintiff that if he took the steps that it advised to

protect his account and information, they would be safe from incursion by unauthorized third parties.

136.     These representations by Verizon were material to Plaintiff's decisions to establish and maintain service, and conduct himself in light of the breach of his account.

137.     These representations were materially false.

138.     Verizon intended that Plaintiff would act or rely upon its misrepresentations.

139.     Verizon knew that Plaintiff would probably rely on Verizon's misrepresentations.

140.     Verizon knew that Plaintiff would likely suffer harm by relying on its misrepresentations.

141.     Plaintiff reasonably relied to its detriment on Verizon's misrepresentations.

142.     As a direct and proximate result of his reasonable reliance to its detriment on Verizon's misrepresentations, Plaintiff suffered damages.

WHEREFORE, Plaintiff Bryan Volz requests that this Court enter judgment in his favor and against Verizon for (A) compensatory damages in the amount of at least $452,000, or in such other amount as may be proven at trial; plus (B) post-judgment interest at the statutory rate; plus (C) such other and further relief as the nature of Plaintiff's cause may require.

## COUNT VI
## Violations of Maryland's Consumer Protection Act, Md. Code, Com. § 13-408
## (Against Verizon)

143.     Plaintiff realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

144.     As a Verizon customer, Plaintiff engaged in transactions with Verizon concerning his wireless service. Plaintiff sought and acquired services from Verizon for his personal, family and household purposes.

145.     Verizon has engaged in unfair methods of competition and unfair or deceptive acts or practices intended to result and which did result in the sale of wireless services to Plaintiff, as detailed herein.

146.     Verizon's acts and representations concerning the safeguards it employs to protect consumer account data, including Plaintiff's data, are likely to mislead reasonable consumers, including Plaintiff, as detailed herein.

147.     Verizon has represented that its goods or services have characteristic and/or benefits that they do not have. Specifically, Verizon represented that, in purchasing Verizon wireless cell service and using Verizon-compatible phones, Plaintiff's confidential data would be safeguarded and protected.

148.     In actuality, as alleged fully above, Verizon's wireless service did not protect and/or safeguard Plaintiff's data from unauthorized access, and Verizon's employees did in fact sell access to customers' personal information, as detailed herein.

149.     Verizon's misrepresentations and omissions concerning its safeguarding of customers' data were materially misleading. As alleged fully above, a reasonable person would attach importance to the privacy of his sensitive account data in determining whether to contract with a wireless cell phone provider.

150.     Verizon was obligated to disclose the shortcomings of its data protection practices, as Verizon had exclusive knowledge of material facts not known or knowable to its customers, Verizon actively concealed these material facts from its customers, and such disclosures were necessary to materially qualify its representations that it did not sell and took measures to protect consumer data and its partial disclosures concerning its use of customers' CPNI. Further admissions were necessary to prevent Verizon's statements from misleading the public in light of

the undisclosed facts concerning its security procedures.

151.    Further, Verizon was obligated to disclose its practices, by seeking consent beforehand or informing customers of breaches in the aftermath, under the FCA.

152.    Verizon is a merchant, as defined in Maryland's Consumer Protection Act (the "CPA").

153.    Plaintiff is a consumer, as defined the CPA.

154.    Verizon's misrepresentations and failures to disclose information as described in this Complaint constitute unfair and/or deceptive trade practices as a defined in the CPA.

155.    Plaintiff was deceived by Verizon's unfair and/or deceptive trade practices.

156.    As a direct and proximate result of Verizon's unfair and deceptive trade practices, Plaintiff suffered harm.

157.    Plaintiff seeks compensatory and statutory damages, and injunctive relief for Verizon's violations of the Maryland Consumer Protection Act (the "CPA"). Plaintiff also demands reimbursement of its attorneys' fees under the CPA.

158.    Plaintiff also seeks injunctive relief to stop Verizon's unfair and unlawful practices and in order to protect the public and restore money or property taken as a result of Verizon's unfair methods of competition and unfair or deceptive acts or practices. Plaintiff seeks a mandatory cessation of Verizon's practices and proper safeguarding of confidential customer account data.

WHEREFORE, Plaintiff Bryan Volz requests that this Court enter judgment in his favor and against Verizon for (A) compensatory damages in the amount of at least $452,000, or in such other amount as may be proven at trial; plus (B) post-judgment interest at the statutory rate; plus (C) reimbursement of its reasonable fees and costs of attorneys and expert witnesses (whether testifying or not) incurred in this action; plus (D) an Order enjoining Verizon from further

violations of Maryland and Federal law; plus (E) such other and further relief as the nature of Plaintiff's cause may require.

## COUNT VII
## Breach of Contract
## (Against Verizon)

159.    Plaintiff repeats and realleges the allegations of the paragraphs above as if fully set forth herein.

160.    Plaintiff and Verizon were parties to a valid, legally binding, and enforceable contract, namely the "Verizon Customer Agreement."   A copy of the Verizon Customer Agreement is attached hereto as **Exhibit 1** and incorporated herein by this reference.

161.    Verizon materially breached the Verizon Customer Agreement by, *inter alia*, failing to protect Plaintiff's account information, and permitting the SIM Swap and the resultant looting of Plaintiff's Coinbase Accounts.

162.    Plaintiff had performed all of his obligations under the Verizon Customer Agreement at the time of Verizon's material breach.

163.    As a direct and proximate result of Verizon's various material breaches of the Verizon Customer Agreement, Plaintiff has suffered damages.

WHEREFORE, Plaintiff Bryan Volz requests that this Court enter judgment in his favor and against Verizon for (A) compensatory damages in the amount of at least $452,000, or in such other amount as may be proven at trial; plus (B) post-judgment interest at the statutory rate; plus (C) such other and further relief as the nature of Plaintiff's cause may require.

**COUNT VIII**
**Negligence**
**(Against Coinbase)**

164.     During the several months preceding the Crypto Theft, Plaintiff received numerous emails purportedly from Coinbase.  Due to the odd nature of these emails, Plaintiff believed at the time that there was a potential security issue with his Coinbase Accounts.

165.     As a result of receiving the emails, Plaintiff contacted Coinbase on several occasions to make Coinbase aware that Plaintiff believed that a hacker may be attempting to compromise his Coinbase Accounts.

166.     Coinbase's response to Plaintiff's alerts was to send an email to Plaintiff describing additional security measures Plaintiff may take to secure his Coinbase Accounts.

167.     Notwithstanding the foregoing, Coinbase took no steps to provide adequate security for Plaintiff's Coinbase Accounts, despite Coinbase's assurance to the public that it provides a safe and secure platform for its users.

168.     On December 30, 2021, Plaintiff received yet another email purportedly from Coinbase.  Believing that another attempt was being made by a bad actor to illegally access Plaintiff's Coinbase Accounts, Plaintiff contacted Coinbase by email at approximately 2:00 p.m. Prevailing Eastern Time to alert Coinbase of Plaintiff's concerns.

169.     Despite this notification, Coinbase did nothing to protect Plaintiff's Coinbase Accounts.

170.     Plaintiff followed up again with Coinbase, finally able to contact Coinbase by telephone at approximately 7:30 p.m. Eastern Time on December 31, 2021.

171.     However, by this time, the Coinbase Accounts had been compromised, resulting in the unauthorized transfer of 120.280739 Ethereum ("ETH"), a digital currency, worth at the time approximately $452,000.00.

172.     Between 5:25:07 p.m., Eastern Time and 6:17:13 p.m., Eastern Time, fifty-eight transactions occurred on the Coinbase Accounts transferring the ETH to two separate accounts not belonging to Plaintiff.

173.     Plaintiff did not authorize the foregoing transactions and had no knowledge of their occurrence at the time.

174.     Coinbase owed Plaintiff a duty of reasonable care.

175.     Coinbase breached this duty by negligently, carelessly, and recklessly collecting, maintaining, and controlling Plaintiff's funds and cryptocurrency, and by failing to protect them from exposure to unauthorized third parties.

176.     As a direct and proximate result of Coinbase's breach of its duty of care to Plaintiff, Plaintiff suffered damages.

WHEREFORE, Plaintiff Bryan Volz requests that this Court enter judgment in his favor and against Verizon for (A) compensatory damages in the amount of at least $452,000, or in such other amount as may be proven at trial; plus (B) post-judgment interest at the statutory rate; plus (C) such other and further relief as the nature of Plaintiff's cause may require.

## COUNT IX
### Negligent Misrepresentation
### (Against Coinbase)

177.     Plaintiff repeats and realleges the allegations of the paragraphs above as if fully set forth herein.

178.     Coinbase represented to Plaintiff, through its statements and categorizations, that it offered a safe and secure platform for the exchange and storage of funds, cryptocurrency, and other assets.

179.    Coinbase failed to conduct a reasonable and diligent investigation of the representations it made to Plaintiff to ensure that those statements were true and that there was no omission of material facts required to make the representations not misleading.

180.    Coinbase, in the exercise of reasonable care, should have known its statements and omissions were misleading.

181.    Coinbase owed a duty to Plaintiff to speak with care and explain fully and truthfully all material facts regarding the security of his Coinbase Accounts and the availability and methods of remediating errors in electronic transfers. This duty arose from several bases under state and federal law, including Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "deceptive acts or practices in or affecting commerce." This provision encompasses material representations, omissions, or practices that are likely to mislead a reasonable consumer.

182.    Coinbase intended that Plaintiff would rely on its negligent misrepresentations.

183.    Coinbase knew that Plaintiff would rely on its misrepresentations and omissions in using the Coinbase platform and exchange for the transfer and storage of funds, assets, and cryptocurrencies.

184.    Coinbase's negligent misrepresentations and omissions were intended to induce, and actually induced, Plaintiff to use the Coinbase platform and exchange for the transfer and storage of funds, assets, and cryptocurrencies.

185.    Plaintiff reasonably relied to his detriment on Coinbase's negligent misrepresentations.

186.    As a direct and proximate result of his reliance on Coinbase's negligent misrepresentations, Plaintiff has suffered damages.

WHEREFORE, Plaintiff Bryan Volz requests that this Court enter judgment in his favor

and against Verizon for (A) compensatory damages in the amount of at least $452,000, or in such other amount as may be proven at trial; plus (B) post-judgment interest at the statutory rate; plus (C) such other and further relief as the nature of Plaintiff's cause may require.

## COUNT X
### Violation of Cal. Civ. Code § 1838
### (Against Coinbase)

187.   Plaintiff repeats and realleges the allegations of the paragraphs above as if fully set forth herein.

188.   Plaintiff deposited funds and cryptocurrencies into his Coinbase Accounts in order to use, store, keep, sell, trade, or exchange cryptocurrencies.

189.   Plaintiff gave consideration for the funds and cryptocurrencies deposited with Coinbase in the form of commissions and fees.

190.   Coinbase is a bailee of the personal property of Plaintiffs. Plaintiff is a bailor of his personal property.

191.   As a bailee, Coinbase had an obligation to return or account for the deposited personal property upon demand.

192.   By its own acts or omissions, Coinbase caused the personal property deposited by Plaintiff to be lost.

193.   Coinbase has refused to return the personal property deposited by Plaintiff.

194.   Coinbase has refused to provide complete disclosure to Plaintiff regarding the circumstances under which the loss of property occurred. As a result, Coinbase is presumed to have willfully, or by gross negligence, permitted the loss or injury to occur pursuant to Cal. Civ. Code § 1838.

195.     As a direct and foreseeable consequence of Coinbase's transfer of Plaintiff's assets Plaintiff pursuant fraudulent orders, and of Coinbase's failure to credit Plaintiff's Coinbase Accounts to correct those unauthorized transfers, Plaintiff was suffered damages.

WHEREFORE, Plaintiff Bryan Volz requests that this Court enter judgment in his favor and against Verizon for (A) compensatory damages in the amount of at least $452,000, or in such other amount as may be proven at trial; plus (B) post-judgment interest at the statutory rate; plus (C) such other and further relief as the nature of Plaintiff's cause may require.

**COUNT XI**
**Violation of California Consumer Legal Remedies Act**
**(Against Coinbase)**

196.     Plaintiff repeats and realleges the allegations of the paragraphs above as if fully set forth herein.

197.     At all relevant times, Plaintiff was a "consumer" under the terms of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*, as an individual seeking or acquiring, by purchase or lease, goods or services for personal, family, or household purposes.

198.     Coinbase's actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CLRA.  The assets involved in the unauthorized transactions are "goods" and Coinbase's financial and online platform services are "services" under the CLRA.

199.     Coinbase violated the CLRA by, among other things, making false statements and omitting truthful information about its services and including unconscionable and/or unlawful provisions in its contracts with Plaintiff.

200.    Coinbase's misrepresentations were material. Coinbase's violations of the CLRA were a substantial factor in causing Plaintiff to use Coinbase's services.

201.    As a direct and proximate consequence of these actions, Plaintiff suffered injury.

202.    Coinbase's conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiff and refused to remedy the breach of its platform and exchange long after learning of the inadequacy of its data protection and security measures and of the unauthorized access and use of its customers' accounts.

WHEREFORE, Plaintiff Bryan Volz requests that this Court enter judgment in his favor and against Verizon for (A) compensatory damages in the amount of at least $452,000, or in such other amount as may be proven at trial; plus (B) post-judgment interest at the statutory rate; plus (C) such other and further relief as the nature of Plaintiff's cause may require.

## COUNT XII
## Violation of California Unfair Competition Law
### (Against Coinbase)

203.    Plaintiff repeats and realleges the allegations of the paragraphs above as if fully set forth herein.

204.    Coinbase and Plaintiff are "persons" within the meaning of the California Unfair Competition Law ("UCL"). Cal. Bus. & Prof. Code § 17201.

205.    Coinbase engaged in unlawful, fraudulent, and/or unfair conduct that is harmful and deceiving to consumers within the meaning of the UCL.

206.    By way of example, and not of limitation, Coinbase has violated  California Civil Code § 1838 and other California laws as more fully described in this Complaint.

207.    Coinbase owed Plaintiff a duty to, *inter alia*, speak truthfully regarding the security of Plaintiff's account.

208.    Coinbase materially breached this duty by its various misrepresentations and ommissions as described in this Complaint.

209.    Plaintiff acted in direct reliance on Coinbase's material misrepresentations regarding the security of his account.

210.    Plaintiff suffered injuries in fact and lost money or property as a result of Coinbase's violations of the UCL.

211.    Plaintiff's reliance on Coinbase's material misrepresentations was a substantial factor in causing the damages suffered by Plaintiff.

212.    Coinbase's conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous.

213.    The gravity of Coinbase's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Coinbase's legitimate business interests other than engaging in this wrongful conduct.

WHEREFORE, Plaintiff Bryan Volz requests that this Court enter judgment in his favor and against Verizon for (A) compensatory damages in the amount of at least $452,000, or in such other amount as may be proven at trial; plus (B) post-judgment interest at the statutory rate; plus (C) such other and further relief as the nature of Plaintiff's cause may require.

## COUNT XIII
## Breach of Contract
## (Against  Coinbase)

214.    Plaintiff repeats and realleges the allegations of the paragraphs above as if fully set forth herein.

215.    Plaintiff and Coinbase were parties to a valid, legally binding, and enforceable contract, namely the "User Agreement."  A copy of the User Agreement is attached hereto as

**Exhibit 2** and incorporated herein by this reference.

216.    Coinbase materially breached the User Agreement by, *inter alia*, permitting the Crypto Theft to occur.

217.    Plaintiff had performed all of his material obligations under the User Agreement at the time of Coinbase's material breaches of the User Agreement.

218.    As a direct and proximate result of Coinbase's material breaches of the User Agreement, Plaintiff has suffered damages.

WHEREFORE, Plaintiff Bryan Volz requests that this Court enter judgment in his favor and against Verizon for (A) compensatory damages in the amount of at least $452,000, or in such other amount as may be proven at trial; plus (B) post-judgment interest at the statutory rate; plus (C) such other and further relief as the nature of Plaintiff's cause may require.


Dated: May 15, 2024                          /s/ Michael J. Lentz
                                              Michael J. Lentz (Fed. Bar No. 26097)
                                              Dennis J. Shaffer (Fed. Bar No. 25680)
                                              Joseph M. Selba (Fed. Bar No. 29181)
                                              TYDINGS & ROSENBERG LLP
                                              One East Pratt Street, Suite 901
                                              Baltimore, Maryland 21202
                                              Phone: (410) 752-9700
                                              Fax: (410) 727-5460
                                              mlentz@tydings.com
                                              dshaffer@tydings.com
                                              jselba@tydings.com